﻿Citation Nr: AXXXXXXXX
Decision Date: 03/18/19 Archive Date: 03/18/19

DOCKET NO. 181210-1239
DATE: March 18, 2019

ORDER

1. Entitlement to an effective date of November 8, 1986 for the grant of service connection for right-sided rib fractures is granted.

2. Entitlement to an effective date of November 8, 1986 for the grant of service connection for residuals of a right scapula fracture is granted.

3. Entitlement to an effective date of November 8, 1986 for the grant of service connection for trunk scarring, residuals of right pneumothorax, is granted.

4. Entitlement to an initial disability rating for osteomyelitis of the left ilium in excess of 20 percent from February 1, 1992 to June 3, 1994, in excess of 20 percent from July 6, 1995, and in excess of 10 percent from February 1, 1997 is denied.

FINDINGS OF FACT

1. The Veteran’s initial claim of entitlement to service connection for residuals of a back injury from a motor vehicle accident was filed on November 14, 1986, shortly after his release from active service on November 7, 1986; this claim was subsequently denied within a May 1987 rating decision because it was determined that the injuries sustained by the Veteran in the August 1985 motor vehicle accident were the result of willful misconduct.

2. A September 1985 record of inpatient treatment, which was of record at the time of the May 1987 rating decision specifically documents the Veteran’s involvement in a motor vehicle accident on August 11, 1985, which resulted in various injuries, including a right scapula fracture, multiple right rib fractures, and a right pneumothorax.

3. Thereafter, in July 2016, VA obtained relevant official service department records that existed and had not been associated with the claims file when VA first decided the claim. An August 1985 DA Form 2173 documented that the August 1985 injuries (including a right scapula fracture, multiple right rib fractures, and a right pneumothorax as documented by the September 1985 inpatient treatment record) were determined to be in the line of duty.

4. From February 1, 1992 to June 3, 1994, the Veteran’s osteomyelitis of the left ilium was manifested by no worse than active infection with discharging sinus or other evidence of active infection within the past 5 years.

5. From July 6, 1995, the Veteran’s osteomyelitis of the left ilium was manifested by no worse than active infection with discharging sinus or other evidence of active infection within the past 5 years.

6. From February 1, 1997, the Veteran’s osteomyelitis of the left ilium was manifested by no worse than inactive infection, following repeated episodes, without evidence of active infection in the past 5 years.

CONCLUSIONS OF LAW

1. The criteria for an effective date of November 8, 1986 for the grant of service connection for right-sided rib fractures have been met. 38 U.S.C. §§ 5107, 5110 (2012); 38 C.F.R. §§ 3.102, 3.156, 3.400 (2017).

2. The criteria for an effective date of November 8, 1986 for the grant of service connection for residuals of a right scapula fracture have been met. 38 U.S.C. §§ 5107, 5110 (2012); 38 C.F.R. §§ 3.102, 3.156, 3.400 (2017).

3. The criteria for an effective date of November 8, 1986 for the grant of service connection for trunk scarring, residuals of right pneumothorax, have been met. 38 U.S.C. §§ 5107, 5110 (2012); 38 C.F.R. §§ 3.102, 3.156, 3.400 (2017).

4. The criteria for an initial disability rating for osteomyelitis of the left ilium in excess of 20 percent from February 1, 1992 to June 3, 1994, in excess of 20 percent from July 6, 1995, and in excess of 10 percent from February 1, 1997 have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 4.1, 4.2, 4.3, 4.7, 4.10, 4.71a, Diagnostic Code (DC) 5000 (2017).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran had active service from November 1983 to November 1986 and from June 1994 to July 1995.

Effective Dates

The statutory guidelines for the determination of an effective date of an award of disability compensation are set forth in 38 U.S.C. § 5110 (2012). Generally, the effective date of an evaluation and award of compensation based on an original claim or a claim reopened after final disallowance will be the date of receipt of the claim or the date entitlement arose, whichever is the later. 38 C.F.R. § 3.400 (2017). The effective date of an award of disability compensation based on direct service connection is the date following separation from service, if the claim is received within one year of that date; otherwise, the effective date is the date VA receives the claim, or the date entitlement arose, whichever is later. 38 U.S.C.A. § 5110(a), (b)(1) (2012); 38 C.F.R. § 3.400(b)(2)(i).

38 C.F.R. § 3.156(c) (2017) requires VA to reconsider a claim “at any time after VA issues a decision on a claim, if VA receives or associates with the claims file relevant official service department records that existed and had not been associated with the claims file when VA first decided the claim.”

1. Entitlement to an effective date prior to April 4, 2016 for the grant of service connection for right-sided rib fractures.

2. Entitlement to an effective date prior to September 2, 2014 for the grant of service connection for residuals of a right scapula fracture.

3. Entitlement to an effective date prior to September 2, 2014 for the grant of service connection for trunk scarring, residuals of right pneumothorax.

The Veteran seeks entitlement to earlier effective dates prior to April 4, 2016 for the grant of service connection for right-sided rib fractures and prior to September 2, 2014 for the grants of service connection for residuals of a right scapula fracture and trunk scarring, residuals of right pneumothorax. Specifically, the Veteran asserts that 3.156(c) is applicable and that his claims should be granted effective dates of November 8, 1986, consistent with the day after his release from active service based upon his initial date of claim.

The Veteran filed his initial claim of entitlement to service connection for residuals of a back injury on November 14, 1986, shortly after his release from active service on November 7, 1986. A January 1987 VA examination contains an September 1985 record of inpatient treatment, which documents the Veteran’s involvement in a motor vehicle accident on August 11, 1985 when his car ran off the road and resulted in injuries including a right scapula fracture, multiple right rib fractures, and a right pneumothorax. This claim was subsequently denied within a May 1987 rating decision because it was determined that the injuries sustained by the Veteran in the August 1985 motor vehicle accident were the result of willful misconduct. Significantly, however, the May 1987 rating decision did not consider the Veteran’s service personnel records. 

Thereafter, a November 2006 administrative decision declined to reopen the Veteran’s claim. A January 2015 rating decision denied reopening the Veteran’s claim of entitlement to service connection for residuals of a back injury, in addition to denying claims of entitlement to service connection for degenerative arthritis, a lung condition, and a scapula condition, all claimed as secondary to residuals of a back injury. 

In July 2016, the Veteran’s attorney provided VA with a copy of an August 1985 DA Form 2173, Statement of Medical Examination and Duty Status. This form documents that the injuries sustained by the Veteran in the August 1985 motor vehicle accident were in the line of duty. Thereafter, VA obtained the Veteran’s service personnel records, which also contained the August 1985 DA Form 2173. Given this, and based upon the provisions of 38 C.F.R. § 3.156(c), VA accepted the service department’s line of duty finding and a September 2016 rating decision granted service connection for various disabilities related to the Veteran’s in-service motor vehicle accident; however, the effective dates of these grants were based upon the dates of various claims to reopen, rather than the Veteran’s initial date of claim in November 1986. Similarly, a November 2016 rating decision granted service connection for the disabilities at issue in the current appeal for earlier effective dates, namely: right-sided rib fractures, residuals of a right scapula fracture, and trunk scarring as residual of a right pneumothorax; again, the effective dates assigned were based upon relevant claims to reopen submitted by the Veteran. More recently, a March 2017 rating decision granted service connection for osteomyelitis of the left ilium, effective November 8, 1986, and also assigned earlier effective dates of November 8, 1986 for the various disabilities granted service connection within the prior September 2016 rating decision, consistent with the Veteran’s initial date of claim and 38 C.F.R. § 3.156(c). Significantly, however, the March 2017 rating decision did not address the effective dates for the disabilities at issue in the current appeal, namely: right-sided rib fractures, residuals of a right scapula fracture, and trunk scarring as residual of a right pneumothorax. 

In a December 2018 submission, the Veteran’s attorney asserted that the March 2017 rating decision erroneously failed to grant earlier effective dates for the three disabilities at issue (right-sided rib fractures, residuals of a right scapula fracture, and trunk scarring as residual of a right pneumothorax) because such conditions also arose from the Veteran’s in-service motor vehicle accident, and therefore, also fell within the scope of his initial November 1986 claim. The attorney stated that the Veteran initially claimed residuals of a back injury but that he also reasonably expected that VA would consider service connection for all his residual injuries related to his August 1985 in-service motor vehicle accident. Indeed, it appears to the Board that VA has done just that for some of the Veteran’s current service-connected disabilities, as it properly assigned effective dates for several disabilities in conjunction with the Veteran’s November 1986 claim as required by 38 C.F.R. § 3.156(c). 

Moreover, the Board finds no reason why VA has not done so with the three disabilities at issue in the current appeal for earlier effective dates. As stated above, a January 1987 VA examination contains an September 1985 record of inpatient treatment, which clearly documents that the Veteran’s involvement in an August 11, 1985 motor vehicle accident resulted in a right scapula fracture, multiple right rib fractures, and a right pneumothorax. The Board finds this significant and probative evidence, which supports the Veteran’s claim that 38 C.F.R. § 3.156(c) is also applicable to the three disabilities on appeal. 

In conclusion, the Board finds that following the May 1987 rating decision, which denied the Veteran’s initial claim because it was determined that the Veteran’s August 1985 injuries, including a right scapula fracture, multiple right rib fractures, and a right pneumothorax, were the result of willful misconduct, VA obtained relevant official service department records in July 2016 that existed and had not been associated with the claims file when VA first decided the claim, specifically, an August 1985 DA Form 2173, which documented that the August 1985 injuries (including a right scapula fracture, multiple right rib fractures, and a right pneumothorax) were in the line of duty. As such, the proper effective date of the grant of service connection for right-sided rib fractures, residuals of a right scapula fracture, and trunk scarring as residual of a right pneumothorax is November 8, 1986, which is one day after his release from active service consistent with his initial November 1986 claim.

Increased Ratings

Disability evaluations are determined by evaluating the extent to which a veteran’s service-connected disability adversely affects his or her ability to function under the ordinary conditions of daily life, including employment, by comparing his or her symptomatology with the criteria set forth in the Schedule for Rating Disabilities.

Whether the issue is one of an initial rating or an increased rating, separate ratings can be assigned for separate periods of time based on the facts found, a practice known as “staged” ratings.

4. Entitlement to an initial disability rating for osteomyelitis of the left ilium in excess of 20 percent from February 1, 1992 to June 3, 1994, in excess of 20 percent from July 6, 1995, and in excess of 10 percent from February 1, 1997.

The Veteran’s osteomyelitis of the left ilium has been rated as 20 percent disabling from February 1, 1992 to June 3, 1994, also as 20 percent disabling from July 6, 1995, and as 10 percent disabling from February 1, 1997 under Diagnostic Code (DC) 5000, regarding acute, subacute, or chronic osteomyelitis. See 38 C.F.R. § 4.71a, DC 5000 (2017).

Thereunder, a 10 percent disability rating is warranted for inactive osteomyelitis following repeated episodes, without evidence of active infection in the past 5 years; a 20 percent disability rating is warranted for osteomyelitis with discharging sinus or other evidence of active infection within the past 5 years; a 30 percent disability rating is warranted for osteomyelitis with definite involucrum or sequestrum, with or without discharging sinus; a 60 percent disability rating is warranted for osteomyelitis with frequent episodes, with constitutional symptoms; and a maximum schedular 100 percent disability rating is warranted for osteomyelitis with involvement of the pelvis, vertebrae, or extending into major joints, or with multiple localization or with long history of intractability and debility, anemia, amyloid liver changes, or other continuous constitutional symptoms. A rating for osteomyelitis will not be applied following cure by removal or radical resection of the affected bone.

Private treatment records from January 1992 document that the Veteran was seen for evaluation of his left pelvis following a history of low back surgery with persistent drainage. The physician noted that the sinus tract closed in December [1993] with no recurrence. Upon examination, there was swelling over a residual scar of the left ilium; however, it was not painful, and there was no redness, erythema, or sinus tract. An x-ray revealed sclerosis at the sacroiliac (SI) joint on the left side consistent with a burned-out septic arthritis and osteomyelitis. The physician’s impression included a resolved fistulous tract, and old septic arthritis and osteomyelitis of the left sacroiliac joint.

Thereafter, in January 1994, the Veteran reported pain and swelling of the left hip since December 1993 at the site of a prior bone graft. This was assessed as soft tissue cellulitis without apparent abscess. Later that same month, the Veteran’s cellulitis was noted to have resolved; however, he complained of drainage from the site, which was assessed as a sinus tract. Upon follow up in February 1994, a private physician noted that he was able to pass a probe “quite a distance” up into the subcutaneous tissue; he also noted the Veteran’s condition was improved with antibiotic treatment, without any sign of infectious complication. The physician diagnosed a sinus tract infection of the left hip and noted he “may need to investigate whether or not [the Veteran] has osteomyelitis.” Later that same month, another private physician reviewed the Veteran’s relevant medical history: he had left hip swelling and discharge in 1991 and reported having heard the name “Staph” associated with that wound culture (but that was unsure of the species). The wound responded to antibiotics at that time, but in late 1993, the area swelled up again and he was placed on two different cephalosporin antibiotics; however, the wound was not cultured because the Veteran had already been on antibiotics. The physician noted the wound was now better and the Veteran had no particular symptoms from the area. The physician stated that the Veteran’s recollection of “Staph,” which was responsive to cephalosporins suggested very strongly that the infection was caused by Staph aureus and that it was a form of osteomyelitis; though the physician noted that this was very strange since flat bone osteomyelitis is extremely uncommon, and a review of x-rays revealed no foreign body or area that might appear to be osteomyelitis of the iliac crest.

Upon VA examination in August 2016, a VA examiner reviewed the Veteran’s medical history, including osteomyelitis and septic arthritis following a left hip bone graft in 1985, which also developed a sinus tract that required surgery in 1989 to debride the wound. The examiner noted the Veteran had residual pain and loss of range of motion; however, the examiner concluded that the Veteran had not had any additional episodes or recurring infections of osteomyelitis following the initial infection, and that he did not currently have any signs, symptoms, or findings attributable to osteomyelitis or treatment for osteomyelitis.

An August 2016 osteomyelitis disability benefits questionnaire (DBQ) completed by a private physician, W. B., documents that the Veteran has chronic, recurrent osteomyelitis that is refractory to surgical treatment, will require lifelong antibiotic treatment, and resulted in five or more recurrent infections of osteomyelitis following the initial infection. 

In March 2017, a VA examiner reviewed the conflicting medical evidence discussed above and provided an addendum opinion that the August 2016 private opinion was in error, and that it was less likely than not that the Veteran had a diagnosis of chronic osteomyelitis. The examiner stated that the Veteran’s most recent flare-up was in 1992, over 25 years ago, after which he was documented as being fully recovered and having septic arthritis due to the previous infection. Additionally, he noted the Veteran had two episodes of cellulitis in 1993 and 1994 that were more likely than not unrelated to osteomyelitis. The examiner concluded that the Veteran had been fully recovered since 1992, as there had been no signs of osteomyelitis since that time.

In June 2017, the same private physician who completed the August 2016 DBQ, W. B., submitted a letter, which stated that his previous opinion had not changed. He noted that the Veteran’s osteomyelitis of the pelvis was likely secondary to his 1985 surgery and an incidental bacteremia that led to the subsequent infection; though it was questionable whether the Veteran had nine years of a single poly-microbial infection or give or more separate infections. He concluded that the Veteran never received “complete” treatment for his condition and related that from 1985 to 1988 he had a documented tunneling wound draining foul smelling pus. He noted that the Veteran was seen at the Ann Arbor VAMC in 1989 for debridement surgery, but stated that they did not provide any significant parenteral antimicrobial therapy. In 1991-1992, and again in 1993-1994, the infection reappeared in the left buttock and the Veteran again sought treatment; in this regard, the physician noted that patients with pelvic osteomyelitis frequently develop abscesses in the soft tissues adjacent to the bony pelvis, or that the infection dissects into areas that are quite distant from the site of bony involvement. The physician stated that even with adequate treatment, chronic osteomyelitis in adults is more refractory to therapy, and he noted that the Veteran continued to have osteomyelitis of the pelvis with a long history of intractability and debility, with constitutional symptoms including pain and point tenderness, decreased range of motion of the lumbar spine and left hip, and instability that impact his activities of daily living.

Following a review of the evidence of record, including as discussed above, the Board finds that the preponderance of evidence weighs against the Veteran’s claim of entitlement to an initial disability ratings for osteomyelitis of the left ilium in excess of 20 percent from February 1, 1992 to June 3, 1994, in excess of 20 percent from July 6, 1995, and in excess of 10 percent from February 1, 1997.

In order to warrant an increased 30 percent disability rating from February 1, 1992 to June 3, 1994, and from July 6, 1995, the evidence would need to show osteomyelitis with definite involucrum or sequestrum, with or without discharging sinus. Additionally, in order to warrant an increased 20 percent disability rating from February 1, 1997, the evidence would need to document osteomyelitis with discharging sinus or other evidence of active infection within the past 5 years. However, the probative evidence of record, including as discussed below, documents that the Veteran’s osteomyelitis has largely been resolved since 1992, such that his claim for an increased disability rating is denied for the entire period on appeal.

Notably, in January 1992, a physician stated that his sinus tract closed in December [1993] with no recurrence, and the noted impression was “old” septic arthritis and osteomyelitis of the left sacroiliac joint, which is further evidence that the Veteran’s osteomyelitis has resolved at that time. In January 1994, the Veteran developed cellulitis, which subsequently resolved. To the extent that he developed a sinus tract thereafter, the Board finds it probative that this condition improved with antibiotic treatment, without any sign of infectious complication. Moreover, while a private physician noted he “may need to investigate whether or not [the Veteran] has osteomyelitis,” this remark is speculative in nature and is not probative evidence that the particular infection was, in fact, a recurrence of osteomyelitis. Similarly, while another private physician stated that the Veteran’s recollection of “Staph,” which was responsive to cephalosporins, suggested very strongly that the infection was caused by Staph aureus, a form of osteomyelitis, the Board finds this to lack probative value in order to warrant an increased rating, as the physician concurrently noted that such finding was “very strange,” since flat bone osteomyelitis was extremely uncommon, and a review of x-rays revealed no foreign body or area that might appear to be osteomyelitis of the iliac crest. Moreover, the physician noted that the infected wound had healed, with no particular symptoms from the area. 

To the extent that the findings regarding the Veteran’s osteomyelitis contained within the August 2016 VA examination and August 2016 private DBQ are in stark contrast, the Board affords more probative value to the findings of the August 2016 VA examiner, who concluded that the Veteran had not had any additional episodes or recurring infections of osteomyelitis following the initial infection, and that he did not currently have any signs, symptoms, or findings attributable to osteomyelitis or treatment for osteomyelitis. To the extent that the August 2016 DBQ documents findings by a private physician, which would otherwise warrant an increased disability rating under DC 5000, including chronic, recurrent osteomyelitis that is refractory to surgical treatment, will require lifelong antibiotic treatment, and resulted in five or more recurrent infections of osteomyelitis following the initial infection, the Board affords such findings less probative value. Notably, the private physician appears to have based his findings upon the inaccurate statement that the Veteran was able to recollect treatment for “staph aureus,” which correlates with osteomyelitis. However, as discussed above, the Veteran only recalled treatment for “Staph,” but could not remember the specific type. Moreover, there is no probative evidence that this infection was, in fact, staph aureus, consistent with osteomyelitis. Indeed, a private physician noted at that time that a finding of staph aureus, consistent with osteomyelitis, would be “very strange” given a lack of supporting diagnostic findings and the fact that the Veteran’s infection had healed without residual symptoms. 

Similarly, the March 2017 VA opinion and June 2017 private opinion also provide contrasting assessments of the Veteran’s osteomyelitis. The Board affords more probative value to the March 2017 VA examiner’s finding that the Veteran had been fully recovered since 1992, without any signs of osteomyelitis since that time. Additionally, the examiner noted that the Veteran’s two episodes of cellulitis in 1993 and 1994 were more likely than not unrelated to osteomyelitis. To the extent that the June 2017 private physician opined that the Veteran’s recurring infections in 1991-1992, and again in 1993-1994, were manifestations of his osteomyelitis, the Board notes that he reasoned that patients with pelvic osteomyelitis frequently develop abscesses in the soft tissues adjacent to the bony pelvis, similar to the Veteran’s infection of the left buttock. However, the Board finds it significant that the private physician’s conclusion is unsupported by the evidence of record. Rather, the evidence concurrent to the 1992 and 1994 infections does not definitively document that the Veteran’s infection was caused by recurrence of osteomyelitis; in fact, another private physician stated at that time that a finding of staph aureus, consistent with osteomyelitis, would be “very strange” given a lack of supporting diagnostic findings, and the fact that the Veteran’s infection had healed without residual symptoms. As such, the Board affords the June 2017 private opinion little probative value as it is inconsistent with, and unsupported by, the additional evidence of record as discussed.

To the extent that the Veteran asserts that an increased disability rating is warranted for his osteomyelitis throughout the staged rating periods on appeal, the Board finds that while his lay statements are probative insofar as they report observable symptoms, they are not probative evidence insofar as they attempt to opine regarding the severity of a complex and internal condition such as osteomyelitis, given the Veteran’s lack of related medical expertise. 

Similarly, to the extent that the Veteran’s representative asserts that the Veteran’s osteomyelitis warrants a 100 percent disability rating for the entire period on appeal because it was located in his pelvis, the Board finds this conclusory opinion to lack probative value. While the Board concedes that the Veteran’s osteomyelitis infection indeed first manifested in the Veteran’s left pelvis region, DC 5000 explicitly contemplates diagnostic criteria for “acute, subacute, or chronic” osteomyelitis based upon its active or inactive status. Therefore, it is unreasonable to assume that an automatic 100 percent disability rating is warranted for osteomyelitis, which initially manifests in “the pelvis, vertebrae” or extends “into major joints,” but which is later resolved without residual symptoms. Indeed, a note to the diagnostic criteria states that a rating for osteomyelitis will not be applied following cure by removal or radical resection of the affected bone. As such, the Board finds the representative’s assertion to be unpersuasive. Rather, as discussed above, the most probative evidence of record suggests that the Veteran’s osteomyelitis has been resolved without further residuals conclusively attributable to osteomyelitis since 1992.

In sum, the most probative evidence of record suggests that the Veteran’s service-connected osteomyelitis has been resolved since 1992, without any residual signs or symptoms, or conclusive recurrence of osteomyelitis. Given the above, the Board concludes that the preponderance of evidence weighs against the Veteran’s claim of entitlement to an initial disability rating for osteomyelitis of the left ilium in excess of 20 percent from February 1, 1992 to June 3, 1994, in excess of 20 percent from July 6, 1995, and in excess of 10 percent from February 1, 1997. As the preponderance of evidence weighs against the Veteran’s claim, there is no reasonable doubt to be resolved, and the claim for higher ratings than those currently assigned is denied.

 

 

A. P. SIMPSON

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD D. Chad Johnson, Counsel